EXHIBIT "B"

THE BEASLEY FIRM

BY: JAMES E. BEASLEY, ESQUIRE
SLADE H. McLAUGHLIN, ESQUIRE
IDENTIFICATION NO 02636/36653
1125-35 WALNUT STREET
PHILADELPHIA, PA 19107-4997
215  592-1000

PRESENTED FOR REVIEW
02 JUN 14  PM 2: 09
PROPROTHY

ATTORNEY FOR:    PLAINTIFFS

---

DANIEL H. FLEDDERMAN AND COLLEEN M.
FLEDDERMAN, Co-Administrators of the Estate
of AMY MARIE FLEDDERMAN, Deceased and
COLLEEN M. FLEDDERMAN in her own right
319 Crum Creek Lane
Newtown Square, PA 19073

       Plaintiffs

v.

RICHARD P. GLUNK, M.D.
216 Mall Boulevard, Suite 101
King of Prussia, PA 19406

    and

PHILADELPHIA COUNTY
COURT OF COMMON PLEAS
CIVIL TRIAL DIVISION

Complaint – Civil As

FEBRUARY TERM, 2002

NO.    1942

---

"NOTICE

"You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

"YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CAN NOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILA. BAR ASSOC.
LAWYER REFERRAL & INFO.
One Reading Center

"AVISO

"Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede pedir dinero o sus propiedades u otros derechos importantes para usted.

"LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATA-MENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENDIADOS DE FILADELFIA
SERVICIO DE REFERENCIA E INFORMACION
One Reading Center

LEGAL

MAIN LINE PLASTIC SURGERY &
LASER ASSOCIATES, LTD
216 Mall Boulevard, Suite 101
King of Prussia, PA 19406

and

EDWARD DESTEFANO, C.R.N.A.
216 Mall Boulevard, Suite 101
King of Prussia, PA 19406

and

AMBULATORY ANESTHESIA ASSOCIATES, INC.
216 Mall Boulevard, Suite 101
King of Prussia, PA 19406

and

MAIN LINE HEALTH, INC.
130 S. Bryn Mawr Avenue
Bryn Mawr, PA 19010

and

JEFFERSON HEALTH SYSTEM, INC.
259 Radnor-Chester Road
Radnor, PA 19087

and

MONTGOMERY HOSPITAL
1301 Powell Street
Norristown, PA 19404

and

TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA
3400 Spruce Street
121 College Hall
Philadelphia, Pennsylvania 19104

-2-

and                                                            :
                                                               :
HOSPITAL OF THE UNIVERSITY                                     :
    OF PENNSYLVANIA                                            :
3400 Spruce Street                                            :
Philadelphia, PA 19104                                         :
                    Defendants                                 :
                                                               :

---

## CIVIL ACTION COMPLAINT

1.    Plaintiffs incorporate herein by reference the averments of the Complaint filed in Fledderman v. Glunk, M.D., et al., Philadelphia Court of Common Pleas, August Term, 2001, No. 3619 (a true and correct copy of which is attached hereto as Exhibit "A") as if fully set forth at length.

2.    Defendant, Edward DeStefano, C.R.N.A. (hereinafter "Nurse DeStefano"), is and was, at all times material hereto, a certified registered nurse anesthetist licensed to practice anesthesia nursing in the Commonwealth of Pennsylvania with an office located at 111 Scarlet Drive, Conshohocken, Pennsylvania 19428.

3.    Defendant, Ambulatory Anesthesia Associates, Inc. (hereinafter "AAA, Inc."), is and was, at all times material hereto, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania conducting business operations from an office located at 111 Scarlet Drive, Conshohocken, Pennsylvania 19428.

4.    At all times material hereto, AAA, Inc. was the employer of Nurse DeStefano who, at all times material hereto, was acting within the course and scope of the employment relationship. The corporate defendant is, therefore, vicariously liable for the acts, omissions, and other tortious conduct of Nurse DeStefano.

-3-

5.    In May of 2001, Nurse DeStefano was working at the office of Richard P. Glunk, M.D., Main Line Plastic Surgery and Laser Associates, Ltd. at 216 Mall Boulevard, Suite 101, King of Prussia, Pennsylvania 19406.

6.    At all times material hereto, Nurse DeStefano was acting as an agent (actual, express, implied, apparent, ostensible, or otherwise) of Richard P. Glunk, M.D., Main Line Plastic Surgery and Laser Associates, Ltd.

7.    At all times material hereto, Nurse DeStefano acted under the direction, supervision, and control of Dr. Glunk, thereby rendering Dr. Glunk vicariously liable for any negligent act or omission committed by Nurse DeStefano which caused harm to plaintiffs' decedent.

8.    Nurse DeStefano administered anesthesia to Amy Fledderman on May 23, 2001.

9.    Nurse DeStefano never advised Amy Fledderman or her mother that he was a nurse anesthetist, not an anesthesiologist.

10.    Nurse DeStefano was obliged to provide to Amy Fledderman, prior to the performance of anesthesia on her on May 23, 2001, a full and complete description of the risks, benefits, and alternatives to the anesthesia that he was going to administer.

11.    Nurse DeStefano failed to provide the required information, which would have enabled Amy Fledderman to make an informed decision regarding surgery. The administration of anesthesia without an appropriate informed consent constituted a battery.

12.    Nurse DeStefano was careless and negligent in his treatment of plaintiffs' decedent, Amy Fledderman, in the following particular respects:

    a.    Failing to formulate and implement an appropriate anesthesia treatment plan for Amy Fledderman;

-4-

b.    Administering anesthesia to Amy Fledderman in an out-patient ambulatory setting which was neither licensed nor accredited, as required by state law;

c.    Administering anesthesia without adequate supervision by an anesthesiologist;

d.    Failing to recognize Amy Fledderman's deteriorating condition while a patient in Dr. Glunk's office on the date in question and failing to provide appropriate resuscitative measures;

e.    Failing to properly monitor the condition of Amy Fledderman during the course of the liposuction procedure and thereafter;

f.    Failing to immediately transfer Amy Fledderman to a hospital setting once she did not arouse normally from the administration of anesthesia;

g.    Failing to insure available, on site necessary emergency and resuscitative equipment along with experienced, trained personnel to deal with anesthesia/post anesthesia complications such as those experienced by Amy Fledderman;

h.    Failure to formulate and act upon appropriate nursing differential diagnosis for the problems Amy Fledderman was experiencing during emergence from anesthesia and thereafter;

i.    Failing to monitor and record vital signs and other necessary parameters of Amy Fledderman for a number of hours preceding her transfer to Montgomery Hospital;

j.    Delaying initiation of needed medical treatment and supportive care in a hospital setting and, instead, keeping the patient in an unlicensed, unaccredited facility where the records indicate that she was unmonitored, thus increasing the risk of harm to her;

k.    Failing to initiate contact with medical specialists, other than Dr. Glunk, to obtain guidance and information on how to best treat Amy Fledderman's deteriorating condition;

l.    Failing to arrange for prompt transport to a tertiary care hospital before Amy Fledderman's condition deteriorated to the point that the only available option was to transport her to the closest available hospital, which was a community hospital, not a tertiary care facility where her condition could have been managed more appropriately;

m.    Failing to timely recognize and appropriately react to, from a nursing anesthesia standpoint, the emergency situation that developed as the result of the liposuction procedure/administration of anesthesia performed on May 23, 2001;

n.    Failing to call 911 or to otherwise emergently summon medical specialists who could handle the compilations that were being experienced by Amy Fledderman on May 23, 2001;

o.    Failing to have a plan in effect for emergency resuscitative care in an emergency situation such as the one that developed with Amy Fledderman; and

p.    Failing to timely recognize and appropriately act upon, from a nursing anesthesia standpoint, the emergency situation that developed during the period of his care and treatment of Amy Fledderman.

12.    As the direct and proximate result of the aforesaid tortious conduct of the defendant, Nurse DeStefano, Amy Fledderman suffered severe, debilitating, and life threatening injuries, which included:

(a)    Shock;

(b)    Fat embolism syndrome;

(c)    Oxygen deprivation and inability to breathe independently;

(d)    Compromised pulmonary function resulting in a painful death;

(e)    Adult Respiratory Distress Syndrome;

(f)    Acute respiratory failure;

(g)    Pulmonary hypertension;

(h)    Pain so severe that it required the administration of narcotic pain relievers;

(i)    Disseminated Intravascular Coagulation;

-6-

(j)     Frothing and expectorating blood and bloody fluids through her endotracheal tube;

(k)     Constant painful invasive medical care, attention, and procedures in an attempt to cure and otherwise alleviate her deteriorating medical condition and continued suffering; and

(l)     Severe physical pain and suffering and emotional/mental trauma.

13.     The acts, omissions, and other tortious conduct of the above named defendants, Nurse DeStefano and AAA, Inc., increased the risk of harm to Amy Fledderman and were substantial contributing factors in causing her death.

WHEREFORE, plaintiffs, Daniel Fledderman and Colleen Fledderman, co-administrators of the estate of Amy Marie Fledderman, deceased, demand judgment in their favor and against all defendants in an amount in excess of $50,000 together with interest, costs, and damages for delay.

## COUNT I - WRONGFUL DEATH

14.     Plaintiffs incorporate herein by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length.

15.     Daniel H. Fledderman and Colleen M. Fledderman are the natural parents of the decedent, Amy Marie Fledderman, and were appointed the co-administrators of her estate by the Delaware County Register of Wills on or about June 11, 2001.

16.     Mr. and Mrs. Fledderman are bringing this action for wrongful death pursuant to 42 Pa. C.S.A. § 8301 and Pa. R.C.P. 2202(a). The decedent, Amy Fledderman, was survived by her parents, Daniel and Colleen Fledderman, each of whom may be entitled to recover damages for her death, and on whose behalf this action is being brought.

-7-

17. At no time during her lifetime did Amy Fledderman bring an action for her personal injuries, and a companion action for her death has been filed in the case of <u>Fledderman v. Glunk, M.D., et al.</u>, Philadelphia CCP; August Term, 2001; No. 3619.

18. The death of Amy Fledderman and the damages resulting therefrom were proximately caused by the acts, omissions, and other tortious conduct of the defendants named herein, as hereinbefore described in this Complaint.

19. As a direct and proximate result of the death of Amy Fledderman, her heirs have been deprived of future aid, assistance, services, comfort, and financial support.

20. As a further result of the tortious conduct of the above named defendants, her heirs have been caused to expend various sums for hospital, medical, funeral, administration, and other expenses for which they are entitled to recover pursuant to the Wrongful Death Statute.

21. Plaintiffs bring this claim on behalf of the Estate of Amy Fledderman to recover all wrongful death damages permitted by law.

WHEREFORE, plaintiffs, Daniel Fledderman and Colleen Fledderman, co-administrators of the estate of Amy Marie Fledderman, deceased, demand judgment in their favor and against all defendants in an amount in excess of $50,000 together with interest, costs, and damages for delay.

## COUNT II - SURVIVAL

22. Plaintiffs incorporate herein by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length.

23. Plaintiffs, Daniel H. Fledderman and Colleen M. Fledderman, bring this action on behalf of the Estate of Amy Marie Fledderman pursuant to 20 Pa. C.S.A. § 3373 and 42 Pa. C.S.A. § 8302 for damages suffered by the estate as a result of the decedent's death, including the

-8-

decedent's pain and suffering, inconvenience, loss of life's pleasures, loss of earnings, and other items of damages permitted pursuant to this statutory cause of action.

WHEREFORE, plaintiffs, Daniel Fledderman and Colleen Fledderman, co-administrators of the estate of Amy Marie Fledderman, deceased, demand judgment in their favor and against all defendants in an amount in excess of $50,000 together with interest, costs, and damages for delay.

THE BEASLEY FIRM

BY: _____

**JAMES E. BEASLEY**
**SLADE H. McLAUGHLIN**

Dated: 6/13/02

# VERIFICATION

We, Daniel H. Fledderman and Colleen M. Fledderman, make this verification subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities. The attached Complaint is based upon information which we have furnished to our counsel and information which has been gathered by our counsel in preparation for the prosecution of this lawsuit. The language contained in the Complaint is that of counsel and not ours. We have read the Complaint and, to the extent it is based upon information which we have given to our counsel, it is true and correct to the best of our knowledge, information, and belief. To the extent that the contents of the Complaint are that of counsel, we have relied upon our counsel in making this verification.


_____
DANIEL H. FLEDDERMAN, Co-Administrator of
the Estate of Amy Marie Fledderman, deceased


_____
COLLEEN M. FLEDDERMAN, Co-Administrator of
the Estate of Amy Marie Fledderman, deceased


Dated: __6/12/02__

# EXHIBIT "A"

- ASSESSMENT OF DAMAGES HEARING IS REQUIRED
- THIS IS NOT AN ARBITRATION MATTER
- THIS IS NOT A MOTOR VEHICLE ACCIDENT
- JURY TRIAL DEMANDED

**BEASLEY. CASEY & ERBSTEIN**
JAMES E. BEASLEY, ESQUIRE
BY:    SLADE H. McLAUGHLIN, ESQUIRE
IDENTIFICATION NO    02636/36653
1125-35 WALNUT STREET
PHILADELPHIA, PA 19107-4997
(215) 592-1000

ATTORNEY FOR:    PLAINTIFFS

| | |
|---|---|
| DANIEL H. FLEDDERMAN AND COLLEEN M. FLEDDERMAN, Co-Administrators of the Estate of AMY MARIE FLEDDERMAN, Deceased and COLLEEN M. FLEDDERMAN in her own right 319 Crum Creek Lane Newtown Square, PA 19073        Plaintiffs     v. RICHARD P. GLUNK, M.D. 216 Mall Boulevard, Suite 101 King of Prussia, PA 19406      and | PHILADELPHIA COUNTY COURT OF COMMON PLEAS CIVIL TRIAL DIVISION AUGUST TERM, 2001 NO. 3619 |

**"NOTICE**

"You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

"YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILA. BAR ASSOC.
LAWYER REFERRAL & INFO.

**"AVISO**

"Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

"LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
SERVICIO DE REFERENCIA E INFORMACION

MAIN LINE PLASTIC SURGERY &
 LASER ASSOCIATES, LTD
216 Mall Boulevard, Suite 101
King of Prussia, PA 19406

   and

MAIN LINE HEALTH, INC.
130 S. Bryn Mawr Avenue
Bryn Mawr, PA 19010

   and

JEFFERSON HEALTH SYSTEM, INC.
259 Radnor-Chester Road
Radnor, PA 19087

   and

MONTGOMERY HOSPITAL
1301 Powell Street
Norristown, PA 19404

   and

TRUSTEES OF THE UNIVERSITY
 OF PENNSYLVANIA
3400 Spruce Street
121 College Hall
Philadelphia, Pennsylvania 19104

   and

HOSPITAL OF THE UNIVERSITY
 OF PENNSYLVANIA
3400 Spruce Street
Philadelphia, PA 19104
     Defendants

## CIVIL ACTION AMENDED COMPLAINT

I.  **IDENTIFICATION OF PARTIES**

1.      Plaintiffs, Daniel H. Fledderman and Colleen M. Fledderman (hereinafter "Mr. and Mrs. Fledderman"), are the co-administrators of the Estate of Amy Marie Fledderman, deceased, having been so appointed by the Delaware County Register of Wills on or about June 11, 2001. Plaintiffs reside at 319 Crum Creek Lane, Newtown Square, Pennsylvania 19073 and are the natural parents of Amy Fledderman.

2.      Defendant, Richard P. Glunk, M.D. (hereinafter "Dr. Glunk"), is and was, at all times material hereto, a physician licensed to practice medicine in the Commonwealth of Pennsylvania, specializing in plastic surgery, with an office located at 216 Mall Boulevard, Suite 101, King of Prussia, Pennsylvania 19406.

3.      Defendant, Main Line Plastic Surgery & Laser Associates, Ltd (hereinafter "Main Line Plastic Surgery"), is and was, at all times material hereto, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania conducting business operations, including the provision of healthcare services to the public, from an office located at 216 Mall Boulevard, Suite 101, King of Prussia, Pennsylvania 19406.

4.      At all times material hereto, Main Line Plastic Surgery was the employer of Dr. Glunk and other individuals involved with healthcare, clerical, and administrative duties with respect to patient care.  These individuals included, but were not limited to, the nurse anesthetist, the circulating nurse, and the scrub nurse who were involved in Amy Fledderman's liposuction procedure on May 23, 2001.  Main Line Plastic Surgery is vicariously liable for the acts and omissions of all of these individuals, each of whom was acting within the course and scope of the employment relationship.

-3-

BEASLEY. CASEY & ERBSTEIN

5.      Defendant, Main Line Health, Inc. (hereinafter "Main Line Health"), is and was, at all times material hereto, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania conducting business operations from a principal place of business located at 130 S. Bryn Mawr Avenue, Bryn Mawr, Pennsylvania 19010.

6.      Defendant, Jefferson Health System, Inc. (hereinafter "Jefferson Health System"), is and was, at all times material hereto, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania which regularly conducts business in Philadelphia County, Pennsylvania. Jefferson Health System is a large, multi-institutional system with numerous sites. Its Philadelphia County system members include the Albert Einstein Healthcare Network, the Frankford Hospitals, Magee Rehabilitation, and Thomas Jefferson University Hospitals.

7.      At all times material hereto, Dr. Glunk was an agent (actual, express, implied, apparent, ostensible, or otherwise), servant, and employee of Main Line Health and Jefferson Health System.  At the time of the events giving rise to this suit, Dr. Glunk used a Main Line Health/Jefferson Health System treatment consent form which Amy Fledderman and her mother reviewed and relied upon. Dr. Glunk also provided a Jefferson Health System "Division of Plastic and Reconstructive Surgery Post-Op Instruction" form to Amy Fledderman in connection with the liposuction procedure she underwent on May 23, 2001. Similar forms from Jefferson Health System had been used by Dr. Glunk previously, in June of 1999, when he performed surgery on Amy Fledderman. Since Main Line Health and Jefferson Health System had provided Dr. Glunk with forms to use and distribute in connection with patient care, they created the impression that Dr. Glunk was their agent, servant, and employee, that he was affiliated with them, and that they were monitoring the surgeries he performed, whether in his office or in the hospital.

-4-

8.'    Defendant, Montgomery Hospital (hereinafter "Montgomery Hospital"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania which, at all times material hereto, provided healthcare services to the public.  Montgomery Hospital is an institution for the care and treatment of patients which owns, operates, and maintains healthcare facilities and a place of business at 1301 Powell Street, Norristown, Pennsylvania 19404.  At all times material hereto, Montgomery Hospital regularly conducted business in Philadelphia County by virtue of its participation in the Fox Chase Network, which is comprised of a group of community hospitals in Pennsylvania and New Jersey linked with the Philadelphia-based Fox Chase Cancer Center.

9.    At all times material hereto, Montgomery Hospital was acting by and through its agents, servants, employees, and ostensible agents, who were acting within the course and scope of their employment/agency relationship.

10.    Defendant, Hospital of the University of Pennsylvania (hereinafter "HUP"), is an unincorporated subdivision of co-defendant, the Trustees of the University of Pennsylvania (hereinafter "the Trustees"), a not for profit corporation with a business address at 3400 Spruce Street, Philadelphia, Pennsylvania 19104.  HUP is an institution for the care and treatment of patients which operates and maintains hospital facilities and a place of business located at 3400 Spruce Street, Philadelphia, Pennsylvania 19104.

11.    At all times material hereto, HUP and the Trustees were acting by and through their agents, servants, employees, and ostensible agents, who were acting within the course and scope of their employment/agency relationship.

-5-

## II.    __FACTUAL BACKGROUND__

12.    On or about May 15, 2001, Amy Fledderman presented to the office of Dr. Glunk,

accompanied by her mother, Colleen Fledderman (hereinafter "Mrs. Fledderman"), to discuss how

Amy could best lose a few inches around her stomach that had remained despite a 25 pound weight

loss over the previous two years.

13.    Dr. Glunk told Amy that she had genetic fat deposits in the areas of her abdomen and

under her chin which could not be removed by continued exercise, but would require liposuction

treatment.

14.    In his discussion with Amy and her mother, Dr. Glunk minimized the risks of the

liposuction procedure, stressing that Amy was healthy, active, and in great physical shape.

15.    The risk of fat embolism was never mentioned to Amy or to her mother by Dr. Glunk,

nor was the fact that surgery in an office-based setting was not as safe as surgery performed in a

hospital setting. Dr. Glunk provided a Main Line Health/Jefferson Health System treatment consent

form to Amy Fledderman and her mother which they reviewed and relied upon and which created

a belief that:  care was being provided under their supervision, that patients should look to the

institutions, rather than to the individual physician, for care, and that Dr. Glunk was an employee of

Main Line Health/Jefferson Health System, whose affiliated medical facilities would be available

to provide care and treatment to supplement Dr. Glunk's office based setting if the need arose.

16.    Dr. Glunk also gave Amy and her mother a post-op instruction sheet that was labeled:

"Jefferson Health System Division of Plastic and Reconstructive Surgery Post-Op Instruction Form."

Since Dr. Glunk was a plastic surgeon himself, he created the impression by giving out the Jefferson

Health System Division of Plastic and Reconstructive Surgery Post-Op Form, that he was an agent,

servant, and employee of Jefferson Health System, and that the resources of Jefferson Health System would be available to Amy, as needed.

17.    Dr. Glunk had previously given Amy and her mother similar Main Line Health and Jefferson Health System forms in connection with Amy's June, 1999 operation thereby leading them to believe that Dr. Glunk had an ongoing relationship with these institutional defendants which allowed him to perform outpatient surgery as part of the Jefferson Health System Division of Plastic and Reconstructive Surgery and that Main Line Health/Jefferson Health System were monitoring and overseeing the quality of care being provided to Dr. Glunk's patients.

18.    Dr. Glunk reassured Amy that she would be "completely safe" with him and he stated, further, that she would be accompanied, at all times during surgery and post operatively during recovery, by an "anesthesiologist" and two nurses.

19.    The representation by Dr. Glunk that an "anesthesiologist" would be present to administer anesthesia and post-anesthesia care was, in fact, a misrepresentation.  The anesthesia records from the liposuction procedure demonstrate that a nurse anesthestist administered anesthesia and post-anesthesia care, not an anesthesiologist.

20.    During the initial office visit of May 15, 2001, ultrasonic liposuction of the abdomen, flanks, and neck was scheduled for May 23, 2001.

21.    Amy Fledderman and her mother presented to Dr. Glunk's office on May 23, 2001 as scheduled for Amy's liposuction procedure.

22.    Mrs. Fledderman stayed in the waiting room while her daughter, Amy, underwent surgery by Dr. Glunk.

23. At approximately 12:15 p.m., while Amy Fledderman's liposuction procedure was still ongoing, Dr. Glunk inappropriately left the operating room in order to meet with a medical equipment representative to discuss the acquisition of a new medical device.

24. At approximately 1:30 p.m., Dr. Glunk came out to the waiting room and spoke to Mrs. Fledderman. Dr. Glunk said the surgery had gone well, but Amy was resisting coming out of anesthesia. Mrs. Fledderman suggested that her daughter be transferred to a hospital so that she could be monitored overnight. Dr. Glunk rejected this suggestion, and claimed that Mrs. Fledderman was worrying over nothing, and Amy would be fine.

25. Over the course of the next several hours, Dr. Glunk ignored several more requests by Mrs. Fledderman to have her daughter transferred to a hospital, continually stating to Mrs. Fledderman that her daughter was fine and that a rough emergence from this surgery was to be expected because Amy had a similar "rough emergence" from anesthesia two years previous during a surgical procedure he performed upon Amy, which was of shorter duration than this liposuction procedure.

26. Neither Amy Fledderman nor her parents had ever been advised of a prior "rough emergence" from anesthesia during the 1999 surgery by Dr. Glunk.

27. Dr. Glunk finally acceded to Mrs. Fledderman's requests that her daughter be hospitalized, but he told Mrs. Fledderman that she should make the phone calls to Amy's family physician and arrange for the hospitalization herself. Dr. Glunk said that he was going back into surgery to start his next procedure.

28. Mrs. Fledderman insisted, as a time-saving measure, that Dr. Glunk make the necessary arrangements, and suggested that he call 911 to request an ambulance. Mrs. Fledderman

also insisted that Dr. Glunk remain with her daughter rather than starting his next procedure on another patient.

29.     By the time she was moved into the ambulance, Amy Fledderman was in respiratory distress and had to be driven to the closest facility, Montgomery Hospital, for immediate care and treatment in view of the life-threatening nature of her condition at that time.

30.     The inordinate delay by Dr. Glunk and his staff in transferring Amy Fledderman to a hospital setting after she had demonstrated signs of distress was grossly negligent, reckless, willful, wanton conduct which increased the risk that Amy Fledderman would not achieve a satisfactory recovery from her physician-induced medical problems.

31.     After initial assessments at Montgomery Hospital, Mrs. Fledderman was told that her daughter was on a ventilator, but that her breathing tube would be removed sometime during the next day or two, and that her daughter would recover and be fine.

32.     Upon admission to Montgomery Hospital, Amy Fledderman had persistent hypoxia requiring one-hundred percent (100%) FIO2 and PEEP with a presumed diagnosis of acute fat emboli. An initial chest x-ray at Montgomery Hospital suggested alveolar edema.

33.     Amy Fledderman was conscious during her hospitalization at Montgomery Hospital and had repeated complaints of severe pain.

34.     During the period of time from May 23rd through May 24th, Amy Fledderman was evaluated at Montgomery Hospital by specialists in infectious disease, pulmonary medicine, and hematology.

35.     On the morning of May 24, 2001, Amy Fledderman was noted to be drowsy, but asking for sleep aids. She was also noted to be tachycardic with rare bowel sounds and a slight

decrease in deep tendon reflexes. Chest x-ray that morning was still abnormal. Versed was being administered for agitation, and Dilaudid was being administered every one to two hours for pain.

36.     Later in the day on May 24, 2001, Dr. Glunk examined Amy Fledderman at Montgomery Hospital. Following that examination, Mrs. Fledderman had a discussion with Dr. Glunk in which she told him, inter alia, that Mr. Fledderman expected Dr. Glunk at Montgomery Hospital twice a day to confer with the treating doctors and to check Amy's stitches. Dr. Glunk responded that he couldn't put his life on hold for Amy; that he had surgery scheduled all day the following day; and that he was not going to comply with the Fleddermans' request that he visit Amy on a daily basis because he had a medical practice to run, which was of primary importance to him.

37.     By 8:00 p.m. on May 24th, Amy Fledderman was noted to be in respiratory failure with questionable ARDS. A distended abdomen was noted, with positive tenderness.

38.     In the early morning hours of May 25, 2001, Montgomery Hospital's house staff was called to assess Amy Fledderman regarding increased respiratory rate, chest pain, bloody discharge from the breathing tube, and tachycardia. In view of Amy Fledderman's deteriorating condition, the plan was to transfer her to a tertiary medical center, and a note to that effect was entered on her chart between 6:00 a.m. and 8:00 a.m. on May 25, 2001.

39.     Amy Fledderman continued to experience hypoxia and hypotension, with continued and progressive ARDS.

40.     At the time of her discharge from Montgomery Hospital, Amy Fledderman's diagnoses included:

(a) shock;

(b) acute respiratory failure; presumed secondary to fat emboli;

(c) adult respiratory distress syndrome (ARDS);

BEASLEY, CASEY & ERBSTEIN

(d) acute coagulopathy; possible low grade DIC;

(e) acute azotemia;

(f) possible pulmonary hemorrhage; and

(g) pulmonary hypertension.

41.    Amy Fledderman was transferred by helicopter ambulance to HUP on the afternoon of May 25, 2001.

42.    Upon arrival at HUP's intensive care unit, Amy Fledderman was stable.   The admitting diagnoses included:

(a) adult respiratory distress syndrome;

(b) questionable pulmonary hemorrhage, DIC; and

(c) fat emboli.

43.    After her admission to HUP, Amy Fledderman developed hypotension and bradycardia.  A critical care consult indicated that ECMO should be considered, but this modality of treatment was never instituted.

44.    Amy Fledderman sustained two cardiac arrests, but some stabilization was noted after resuscitative treatment was initiated.  Arterial blood gas testing demonstrated acidosis and hypoxia.

45.    Amy Fledderman was pronounced dead at 4:30 p.m. on May 25, 2001.

46.    The injuries and damages alleged in this Complaint were proximately caused by the negligence, carelessness, and tortious conduct of all of the defendants named herein, acting individually and/or through their respective agents, servants, and employees.

WHEREFORE, plaintiffs, Daniel Fledderman and Colleen Fledderman, co-administrators of the estate of Amy Marie Fledderman, deceased, demand judgment in their favor and against all defendants in an amount in excess of $50,000 together with interest, costs, and damages for delay.

-11-

### III.   THEORIES OF LIABILITY

#### A. NEGLIGENCE

### ESTATE OF AMY FLEDDERMAN v. DR. GLUNK, MAIN LINE PLASTIC SURGERY, MAIN LINE HEALTH, AND JEFFERSON HEALTH SYSTEM

47.    Plaintiffs incorporate herein by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length.

48.    Amy Fledderman relied on the medical knowledge, experience, and advice of Dr. Glunk.

49.    Dr. Glunk undertook and/or assumed a duty to Amy Fledderman to render reasonable, proper, adequate, and appropriate medical and surgical care to her and to avoid harm.  Dr. Glunk breached this duty of care in his treatment of Amy Fledderman.

50.    At all times material hereto, Dr. Glunk was an agent, servant, and employee of Main Line Plastic Surgery, thus giving rise to a claim of vicarious and/or ostensible/apparent agency liability against Main Line Plastic Surgery for the tortious conduct of Dr. Glunk. Since Main Line Health and Jefferson Health System had provided forms to Dr. Glunk to distribute to his patients, they created the impression that he was an agent, servant, and employee of theirs; and that they were monitoring the surgeries he performed for quality of care.

51.    At all times material hereto, Dr. Glunk was an agent, servant, and employee of Main Line Health and Jefferson Health System, thus giving rise to a claim of vicarious and/or ostensible/apparent agency liability against these corporate defendants for the tortious conduct of Dr. Glunk.  Since Main Line Health and Jefferson Health System had provided forms to Dr. Glunk to distribute to his patients, they created the impression that he was an agent, servant, and employee of theirs; and that they were monitoring the surgeries he performed for quality of care.

BEASLEY. CASEY & ERBSTEIN

52.     Dr. Glunk was careless and negligent in his treatment of plaintiffs' decedent, Amy

Fledderman, in the following particular respects:

(a)     failing to formulate and implement an appropriate treatment plan for Amy
Fledderman taking into consideration her past medical and surgical history;

(b)     performing technically inadequate and overly aggressive liposuction
procedures, thereby transgressing vasculature in the neck resulting in direct
introduction of fatty material into the blood vessels with resultant bilateral
diffuse pulmonary embolization and massive swelling and hematoma
formation in Amy Fledderman's neck;

(c)     using substandard surgical technique resulting in fat embolism syndrome;

(d)     performing surgery on Amy Fledderman in an office-based setting, which
was not accredited or licensed as required by controlling state regulations;

(e)     failing to perform Amy Fledderman's procedures in a hospital rather than in
an office setting, and failing to advise the patient of this option;

(f)     utilizing the services of a nurse anesthetist, rather than an anesthesiologist,
for purposes of administration of anesthesia and post anesthesia care;

(g)     failing to initiate prophylactic measures prior to surgery to avoid fat
embolism;

(h)     failing to properly monitor the condition of Amy Fledderman during the
course of the liposuction procedure and thereafter;

(i)     failing to promptly recognize, react to, and treat Amy Fledderman's
iatrogenically- induced fat embolism;

(j)     failing to immediately transfer Amy Fledderman to a hospital setting when
she did not arouse normally from anesthesia;

(k)     failing to have available on site necessary emergency and resuscitative
equipment along with experienced, trained personnel to deal with post
surgical complications such as those experienced by Amy Fledderman;

(l)     failing to promptly determine the cause of Amy Fledderman's post surgical
abnormal signs and symptoms;

(m)     failing to timely recognize and appropriately act upon the emergency situation
that developed as a result of the liposuction procedure performed by Dr.
Glunk;

-13-